UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>EX PARTE petition of Ismael Reyes for an Order to Take Discovery Under 28 U.S.C. § 1782 | No. 19-Civ-7219 |

### MEMORANDUM OF LAW IN SUPPORT OF ISMAEL REYES'S *EX PARTE* PETITION FOR JUDICIAL ASSISTANCE UNDER 28 U.S.C. § 1782 TO TAKE DISCOVERY FROM THE BANK OF NEW YORK MELLON

Dated:      August 1, 2019

DAN TAN LAW
Dan Tan
305 Broadway
Suite 750
New York, NY 10007

*Attorneys for Applicant*

Ismael Reyes ("Reyes" or the "Applicant"), by his undersigned attorneys, respectfully files this *ex parte*[1] petition (the "Application") for expedited judicial assistance under 28 U.S.C. § 1782 ("Section 1782") authorizing the Applicant to take discovery from the Bank of New York Mellon ("the Bank") in the form of the attached subpoena *duces tecum* and *ad testificandum* for use in a filed proceeding, *Rizal Commercial Banking Corporation and Ismael Reyes vs. Bank of Bangladesh*, Civil Case No. 19-01010, filed on March 6, 2019, in the Regional Trial Court in Makati City, Philippines (the "Philippines Proceeding").[2]

## PRELIMINARY STATEMENT

This Application is made in support of a pending action in the Regional Trial Court of the Republic of the Philippines captioned *Rizal Commercial Banking Corporation and Ismael Reyes v. Bank of Bangladesh*, Civil Case No. R-MKT-19-1010 CV, which was filed on March 6, 2019 in Makati City, Philippines.  That case concerns Bangladesh Bank's public smearing of Ismael Reyes's pristine reputation in the banking industry in connection with a 2016 heist (the "Heist"), during which criminal hackers stole $81 million from Bangladesh Bank's account at the New York Fed.

In the three years following the Heist, Bangladesh Bank has mounted a vicious and very public campaign to pin the Heist on Applicant Ismael Reyes, an employee of Rizal Commercial Banking Corporation ("RCBC").  It has issued a parade of false and defamatory statements against Reyes, in order to conceal its own incompetence and misconduct and to extort $81

---

[1]  This court routinely entertains *ex parte* applications pursuant to Section 1782.  *See Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*.").  Opposing parties may move to quash a subpoena issued pursuant to a Section 1782 application and preserve their due process rights.  *See id.*

[2]  The Proposed Subpoena is attached as Exhibit C to the Declaration of Dan Tan ("Tan Decl.").  All exhibit references are to the Declaration of Dan Tan in Support of the Application.

million from Reyes and RCBC.  The culmination of these public attacks was the filing of a lawsuit by Bangladesh Bank in this District on January 31, 2019, captioned *Bangladesh Bank v. Rizal Banking Corporation et. al*, No. 19-cv-0093 (Schofield, J.) ("the Southern District of New York lawsuit").  Bangladesh Bank used the filing of the lawsuit to further its publicity stunt and publicly defame Reyes and RCBC.  In fact, Bangladesh Bank launched its defamatory media campaign hours within the filing of its complaint.[3]  The fact that the lawsuit was simply a publicity stunt is made clear by the fact that Bangladesh Bank approached RCBC almost immediately after filing the lawsuit to conduct settlement discussions.  Once Bangladesh Bank received the media coverage it wanted, it no longer needed to proceed with its lawsuit.  RCBC refused to settle and allow Bangladesh Bank to get away with these tactics.

Reyes will not take the fall for Bangladesh Bank's incompetence and misconduct.  In March 2019, Reyes, along with RCBC, filed a defamation action against Bangladesh Bank in the Philippines to recover for the reputational harm already incurred and prevent further damage to his name.  Now, to properly advance his defamation claims in the Philippines, Reyes needs information and documents currently in the possession of the Bank of New York Mellon.

Accordingly, Reyes seeks testimony and documents from the Bank of New York Mellon, which are necessary to the Philippines Proceeding, including:

(1) Non-privileged communications regarding the February 4, 2016 payment order containing SWIFT code IRVTUS3N for Sender's Reference ending in 1500 for USD

---

[3] *See e.g.*, "Bangladesh Sues Philippine Bank Over Cyberheist at New York Fed," dated January 31, 2019, available at https://kfgo.com/news/articles/2019/feb/01/bangladesh-sues-philippine-bank-over-cyberheist-at-new-york-fed/. (Ex. D).  *See also* "Bangladesh Sues RCBC over $81-M Cyberheist," dated February 1, 2019, available at https://www.rappler.com/business/222453-bangladesh-sues-rcbc-cyberheist.  (Ex. E).

$30,000,028.79 (the "Payment Order") sent or received between December 1, 2015 through March 1, 2016;

(2) Non-privileged communications between the Bank of New York Mellon and SWIFT, Bangladesh Bank, The New York Fed, and the FBI regarding the Payment Order sent or received between December 1, 2015 through March 1, 2016;

(3) Documents showing the message traffic related to the Payment Order, including all incoming or outgoing SWIFT messages regardless of message type, all incoming or outgoing FED messages regardless of message type, and all incoming or outgoing CHIPS messages regardless of message type;

(4) Documents showing whether any of the Payment Order were stopped for or flagged for additional review, beyond automated sanctions screening, or repair by operational systems or manual processes, by your institution; and

(5) Policies and procedures for the Bank's anti-money laundering programs from 2015 through 2017.

### FACTUAL BACKGROUND

Applicant Ismael Reyes is a citizen of the Republic of the Philippines.  He is the former National Sales Director of the Retail Banking Group at RCBC and current Segment Head for Marketing Segment, Retail Banking Group and Senior Vice President at RCBC.  Reyes has more than 28 years of banking experience and overseas training.  He obtained his Bachelor of Science in Commerce Major in Accounting from the Far Eastern University in 1974, his Bachelor of Science degree in Commerce major in Economics at the University of Santo Tomas in 1974 and has MBA units from the De la Salle University and units in law from the Ateneo de Manila University.  Reyes has been an employee of RCBC since 2013.

Since 2016, however, the sterling reputation Reyes has built has been the target of malicious and public attacks orchestrated by the Bank of Bangladesh ("Bangladesh Bank") in an effort to conceal its own culpability for the Heist, the largest cyber theft ever executed. The February 2016 Heist—which resulted in the theft of over $81 million—succeeded only because Bangladesh Bank's computer system and network suffered from multiple deficiencies that it negligently failed to identify and remedy.

The elaborate theft began when North Korean Hackers attacked Bangladesh Bank's computer terminals and exploited vulnerabilities in its cybersecurity to access the bank's SWIFT[4] software for financial transactions and transfers. It was the deficiency and inadequacy of Bangladesh Bank's own cybersecurity and financial crime controls that enabled the hackers to effect this successful intrusion into its systems. From within Bangladesh Bank's own terminals, the hackers created and sent at least 35 fraudulent payment orders—often referred to as MT103 messages—calling for the transfer of nearly $1 billion from Bangladesh Bank's deposit account in the New York Fed to multiple accounts at other institutions.

Upon first receiving the SWIFT payment orders, the New York Fed applied its own authentication safeguards and, because of several red flags, denied all of the 35 transfer requests. The New York Fed explained that the payment orders lacked proper formatting for the SWIFT messaging system. Following resubmission of the MT103 messages, the New York Fed approved and processed four of the 35 fraudulent MT103 messages. It transferred $81 million through "Fedwire"—the program developed and used by the Federal Reserve System to transfer high-dollar payments among Federal Reserve offices—into RCBC's "pass-through" accounts at

---

[4] SWIFT, which is short for "Society for Worldwide Interbank Financial Telecommunication," is the network financial institutions use to facilitate international wire transfers and other transactions.

the RCBC's three correspondent Banks, including the Bank of New York Mellon.[5]  RCBC, like

other banks, uses pass-through accounts to facilitate real-time interbank transfers over the

SWIFT network.

      After "fully authenticat[ing]" the fraudulent SWIFT payment orders "in accordance with

their standard authentication protocols," RCBC's three correspondent banks, including the Bank

of New York Mellon, executed the payment instructions and wired the combined $81 million to

several beneficiary accounts maintained at RCBC's Jupiter Business Center.[6]  Once it received

the SWIFT payment orders, RCBC and its employees, including Reyes, took appropriate security

precautions and—just like the New York Fed and RCBC's correspondent banks—determined

that the MT103 messages did not present any compliance issues.  RCBC and its employees

therefore processed the transfer requests and routed the combined $81 million into the four

beneficiary accounts designated in the MT103 messages.  Individuals with ties to Philippine

casinos subsequently withdrew the money from each beneficiary account and laundered it

through the Solaire Casino and Eastern Hawaii Leisure Casino, rendering the funds untraceable.



---

    [5]  *See* "Fed first rejected fund transfers, then moved $81M," available at
https://www.cnbc.com/2016/06/06/ny-fed-first-rejected-cyberheist-transfers.html. (Ex. F).
    [6]  *See Statement on Media Reports About Bangladesh* dated 9 March 2016 of the NY Fed,
available at: https://www.newyorkfed.org/newsevents/statements/2016/0311-2016 (Ex. G).

In the aftermath of the Heist, investigations revealed that Bangladesh Bank had only itself to blame for its $81 million loss and very public embarrassment.  The Finance Minister of Bangladesh acknowledged that the perpetrators could not have created the SWIFT payment orders from within Bangladesh Bank's own network without the involvement of several Bangladesh Bank officials.[7]  Underscoring his own central bank's involvement, he exclaimed, "Of course! One hundred percent they are [involved]."[8]  The "Bangladesh Deputy Inspector General"—*i.e.*, the man leading the investigations into the Heist—agreed with the Finance Minister, asserting that central bank IT technicians most likely provided the inside help.[9]  He posited that they "hooked up [Bangladesh Bank's] transactions system to the public Internet, giving hackers access."[10]  According to the Deputy Inspector General, "[t]here were a number of other things, which if the Bangladesh Bank people had not done, the hacking would not have been possible."[11]

Nevertheless, rather than acknowledge its own responsibility for the Heist, remedy its network and cybersecurity deficiencies, and uphold its obligations to the citizens of Bangladesh, Bangladesh Bank went on the offensive.  It mounted a scorched-earth campaign, initially blaming the New York Fed for its loss.  It stated "[w]e view this as a major lapse on the part of

---

[7]    *See* "Investigator: Some Bangladesh Bank Officials Involved in Heist," available at https://news.mb.com.ph/2016/12/13/investigator-some-bangladesh-bank-officials-involved-in-heist/. (Ex. H).

[8]    *Id.*

[9]    *See* "Bangladesh Police Detail Suspicions of Inside Help on CB Heist," available at https://business.mb.com.ph/2016/12/30/bangladesh-police-detail-suspicions-of-inside-help-in-cb-heist/. (Ex. I).

[10]    *Id.*

[11]    *Id.* ("They needed two types of passwords to carry out the transactions – the hardware token and additional credentials used by bank officials. These password credentials were either given to them by someone or were captured from previous transactions by the malware that logged keystrokes, Alam said.").

the [New York Fed]," and even retained legal counsel in New York "to establish precise grounds of initiating [a] lawsuit claiming recompense."[12]  Bangladesh Bank subsequently switched course, however, redirecting its focus to Reyes and RCBC and embarking on a massive media crusade to falsely paint Reyes and others as corrupt and active co-conspirators in the Heist.

For the last two years, Bangladesh Bank has relentlessly pursued that objective, repeatedly maligning Reyes and others and accusing them of complicity in the theft.  The press surrounding Reyes's arrival at RCBC in 2013 was overwhelmingly positive.  For example, the Business Mirror wrote that "Reyes brings with him years of experience gained in the banking and finance industry" and noted that prior to his appointment, Reyes worked at Philippine Savings Bank in 2008, iRemit Inc. for seven years, and the Bank of the Philippine Islands.  The article stated that Reyes's hiring would assist RCBC to "expand and diversify its revenue streams by growing the non-interest income from its fee-based businesses, such as trust, investment banking, remittance, credit card, wealth management, cash management, bancassurance, and retail banking."[13]

After the Heist, Bangladesh Bank sought to change the narrative on Reyes and manufacture his alleged role in the Heist.  Bangladesh Bank officials took to the press and smeared RCBC officials, including Reyes.  On February 5, 2019, days after the complaint was filed, Former Bangladesh Bank Deputy Governor Dr. Khondoker Ibrahim Khaled stated publicly that "RCBC was directly involved in the BB's cyberheist" and that "its officials helped

---

[12]  *See* "New York Fed Had 'Major Lapse' in Cyber Heist, Bangladesh Says," available at https://businessmirror.com.ph/2016/03/22/new-york-fed-had-major-lapse-in-cyber-heist-bangladesh-says/. (Ex. J).
    [13] *See* "RCBC Names Reyes as New SVP," Business Mirror.  (Ex. K).

laundered [sic] the fund for disbursement through different channels."[14]  A February 13, 2019 article stated that officials of RCBC, including Reyes, were "not yet off the hook" and purported to demand that the DOJ "expedite the process" on the pending investigations.[15]  This negative press has harmed Reyes's personal and professional reputation.

As to RCBC, Bangladesh Bank stated publicly that "RCBC and its officers were involved in a money-laundering conspiracy."[16]  Bangladesh Bank invented and spread these vicious and defamatory falsehoods to conceal its own misconduct and extort $81 million from Reyes and others—the precise amount of money Bangladesh Bank lost during the Heist it negligently enabled.  Bangladesh Bank has endeavored to tarnish Reyes's name and reputation so severely in the hopes that he will succumb to the pressure and pay a debt he absolutely does not owe.

The culmination of this campaign was the Southern District of New York lawsuit, a lawsuit filed in January 2019 in this District against Reyes, RCBC, and other RCBC employees, as well as other Philippine and Chinese individuals allegedly involved in the Heist.  The lawsuit is based on the absurd premise that RCBC would risk legal liability and its reputation to participate in a scheme with North Korean hackers against Bangladesh Bank, all for the sole purpose of earning insignificant transaction fees on funds that remained in RCBC accounts for a matter of days.  The complaint alleges that Reyes, whom officer Raul Tan had designated as the Officer-in-Charge of Retail Banking after he stepped down, chose not to release a hold put in

---

[14] *See* "BB Has Big Chance to Win," available at http://thedailynewnation.com/print-a-news/205267/bb-has-big-chance-to-win.html. (Ex. L).

[15] *See* "6 Other Bank Officials Not Yet Off the Hook – Bangladesh Envoy," available at https://www.philstar.com/headlines/2019/01/13/1884609/6-other-bank-officials-not-yet-hook-bangladesh-envoy. (Ex. M).

[16]  *See* "Bangladesh Wants Cyberheist Case vs RCBC Officials Expedited", available at https://www.gmanetwork.com/news/money/companies/681080/bangladesh-wants-cyberheist-case-vs-rcbc-officials-expedited/story/. (Ex. N).

place on the alleged fictitious accounts RCBC created as part of the Heist.  As previously noted, Bangladesh Bank reached out almost immediately to engage in settlement discussions with Reyes and RCBC.

Seeking to maximize the pressure, Bangladesh Bank has even tried to elicit support for its strategy from government institutions, including those in the United States.  It has demanded that the Department of Justice expedite investigations into the purported role of Reyes and RCBC in the Heist.  And despite its previous comments disparaging the New York Fed, Bangladesh Bank has since secured the New York Fed's assistance in its lawsuit against Reyes and RCBC in the Southern District of New York.[17]  Presumably led astray by Bangladesh Bank officials, the New York Fed signed a "resolution and assistance" agreement in February 2019 to give Bangladesh Bank "technical assistance . . . in its litigation" against Reyes and others.[18]  Raul Tan, another defendant in the Southern District of New York lawsuit, recently received confirmation of such an agreement in response to a FOIA request submitted with the Federal Reserve Board.  Regarding the scope of that assistance, the New York Fed has purportedly agreed to "prepare affidavits and clear employees to testify at hearings or a trial, and also allow Bangladesh Bank representatives to interview employees on relevant and factual matters."[19]

Reyes, however, refuses to capitulate to the bullying tactics of the institution whose own incompetence facilitated an $81 million loss.  Nor will Reyes sit idly by as Bangladesh Bank drags his name through the mud.  Accordingly, Reyes, along with RCBC, initiated a lawsuit against Bangladesh Bank on March 6, 2019 in the Regional Trial Court of the Philippines'

---

[17]  *See* "Update2-Fed Backs Bangladesh as Cyber-heist Lawsuit Kicks Off," available at https://es.reuters.com/article/governmentFilingsNews/idUKL1N1ZW19Q (Ex. O).
[18]  *See id.*
[19]  *Id.*

National Capital Judicial Region.  The Complaint states claims for defamation and seeks over P130,000,000 pesos (which currently equates to over $2.5 million in U.S. dollars) in damages.

Given the Bank of New York Mellon's significant role in critical stages of the Heist as RCBC's correspondent bank, the Bank of New York Mellon possesses important information that Reyes requires to effectively press his claims in the Philippines Proceeding.

Accordingly, Applicant Reyes asks the Court to grant this Application to obtain relevant documents and testimony from the Bank of New York Mellon.

**ARGUMENT**

Section 1782 provides for discovery in the United States to assist tribunals and parties in proceedings before foreign or international tribunals.  In pertinent part, Section 1782 provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . .  The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced . . . .

28 U.S.C. § 1782.

To obtain discovery under Section 1782 an applicant must establish that:  "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made[,] (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

Once the three statutory requirements are satisfied, courts may consider four discretionary factors in deciding whether to grant a Section 1782 application:  (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding;" (2) "the nature of the foreign tribunal, the character of proceedings underway abroad, and the receptivity of the foreign government, court, or agency to federal-court judicial assistance;" (3) "whether the [Section 1782] request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–65 (2004).

12

Moreover, courts in this Circuit "evaluate discovery requests under Section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."  *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997); *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1097 (2d Cir. 1995).  Both the Supreme Court and this Court have acknowledged a Congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings.  *See, e.g.*, *Intel*, 542 U.S. at 247–48 ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179–80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

## I.      APPLICANT SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782

Applicant satisfies the three statutory requirements of Section 1782:  (1) the Bank of New York Mellon resides in the Southern District of New York, (2) the requested information is for use in the Philippine proceeding, which is currently pending in Makati City, Philippines, and (3) Applicant's participation in the Philippines Proceeding makes him an "interested person."

### A.      The Bank of New York Mellon Resides in the Southern District of New York

"Although §1782 does not define what it means to reside or be found in a district, courts in this District . . . have held that at minimum, compelling an entity to provide discovery under § 1782 must comport with constitutional due process."  *In re Fernando Celso de Aquino Chad*, No. 19mc261, 2019 WL 2502060, at *2 (S.D.N.Y. June 17, 2019) (quoting *In re Fornaciari*, 2018 WL 679884, at *2 (S.D.N.Y. Jan. 29, 2018)).

The Bank of New York Mellon has its corporate headquarters in New York, New York at 240 Greenwich Street, New York, New York, 10286.  (Ex. A).  The Bank of New York Mellon therefore resides in the Southern District of New York for the purposes of Section 1782.

**B.      The Discovery Sought Is for Use in a Foreign Proceeding**

The Philippines Proceeding qualifies as a proceeding "in a foreign or international tribunal" for purposes of Section 1782.  Reyes seeks discovery of evidence for use in proceedings against Bangladesh Bank before the Regional Trial Court of the Philippines' National Capital Judicial Region.  The Supreme Court has explained that a judicial or quasi-judicial body "is a § 1782(a) 'tribunal' when it acts as a first-instance decisionmaker," which "requires only that a dispositive ruling, . . . reviewable by the . . . courts, be within reasonable contemplation."  *Intel Corp. v. Adv. Micro Devices, Inc.*, 542 U.S. 241, 246-47, 259 (2004).  Because the Regional Trial Court has the authority to issue a dispositive and reviewable ruling, it qualifies as a tribunal for purposes of Section 1782.  *Id.* at 246-47; *see also In re Application of Elvis Presley Enterprises LLC for an Or. to Take Discovery Pursuant to 28 U.S.C. § 1782*, 2016 WL 843380, at *3 (S.D.N.Y. Mar. 1, 2016) (holding that a German court "indisputably constitutes a foreign tribunal"); *In re Hulley Enterprises, Ltd.*, 2019 WL 691646, at *7 (S.D.N.Y. Feb. 19, 2019) (stating that the "proceeding before the Dutch Appellate Court … qualifies as a 'proceeding in a foreign . . . tribunal'") (citing *Intel*, 542 U.S. at 257-58).

Notably, Reyes is not required to show that the information sought would be discoverable or admissible in the Philippines Proceeding.  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application.").  Rather, Reyes must show only that it has "the *practical ability* . . . to place a beneficial

14

document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017).

Here, Reyes satisfies the "for use in a foreign proceeding" requirement because he is a plaintiff in an active lawsuit, which he filed against Bangladesh Bank in Makati City, Philippines.  Reyes and RCBC filed a lawsuit against Bangladesh Bank in the Republic of the Philippines, Regional Trial Court in the National Capital Judicial Region, Makati City, Metro Manila.  On March 12, 2019, before a scheduled settlement conference at the Conrad Hotel in Pasay City between the representatives of RCBC and Bangladesh Bank, the process server of the Court served a Summons upon Abu Hena Mohammad Razee Hasan, deputy governor and head of Bangladesh Bank Financial Intelligence Unit, and other members of Bangladesh Bank in accordance with Philippine law.  Bangladesh Bank is challenging this service, and an opposition to the challenge has been filed.

The lawsuit was referred to the Acting Presiding Judge Phoeve C. Meer, who entered an order on May 30, 2019 noting that a Manifestation and Counter Manifestation had been filed and setting the case down for referral to Philippine Mediation Center and Judicial Dispute Resolution conference.  Reyes hopes the lawsuit will show that he and RCBC are being used as mere scapegoats despite being innocent parties in the events surrounding the Heist.

Reyes seeks from the Bank of New York Mellon materials that go to the core of his defamation claims in the Philippines Proceeding.  The documents and information requested concern the events of the Heist, the investigations into the conditions and conduct that enabled the theft, and Bangladesh Bank's campaign to harass, defame, and extort RCBC, Reyes, and others.  Without the requested discovery, Reyes will be materially prejudiced in his ability to establish the true extent of Bangladesh Bank's misconduct and the amount of harm it has caused.

C.      **Applicant Reyes Is an Interested Person**

Finally, Section 1782 requires Reyes to demonstrate a reasonable interest in the foreign

proceeding.  While Section 1782 broadly covers those with the right to participate and submit

evidence in foreign proceedings, *see KPMG*, 798 F.3d at 120, there is "[n]o doubt litigants are

included among, and may be the most common example of, the 'interested person[s]' who may

invoke § 1782." *Intel*, 542 U.S. at 256 (quoting 28 U.S.C. § 1782 (alteration in original)).  As a

plaintiff in the Philippines proceeding, Reyes clearly qualifies as an interested person.  *See In re

Gorsoan Ltd. & Gazprombank OJSC*, No. 13 Misc. 397, 2014 WL 7232262, at * 5 (S.D.N.Y.

Dec. 10, 2014) (allowing discovery when order issued pursuant to application made by two

plaintiffs in foreign proceedings at issue).

II.     **ALL OF THE DISCRETIONARY FACTORS OF SECTION 1782 FAVOR
        PERMITTING DISCOVERY**

If an applicant satisfies the statutory requirements, which Reyes does, a court may

consider four discretionary factors.  *Intel*, 542 U.S. at 264–65.  Here, each factor weighs in favor

of granting the requested discovery.  *First*, the Bank of New York Mellon is not a party in the

Philippines Proceeding.  *Second*, there is no reason to believe that the court in the Philippines

Proceeding would be unreceptive to evidence obtained through Section 1782 discovery.  *Third*,

Reyes is acting in good faith and is not seeking to circumvent any foreign restriction on

gathering evidence.  *Fourth*, Reyes's requests target discrete, key events and issues from a

narrow time period underlying the allegations in the Philippines Proceeding.  Thus, the requests

do not impose an undue burden on the Bank of New York Mellon.

A.      **The Bank of New York Mellon Is Not A Party to the Philippines Proceeding**

The first *Intel* factor asks whether the party from whom discovery is sought is a party to

the foreign proceeding.  "[W]hen the person from whom discovery is sought is a participant in

16

the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily

is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at

264.  Whereas "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself

order them to produce evidence[,] . . . nonparticipants in the foreign proceeding may be outside

the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States,

may be unobtainable absent § 1782(a) aid." *Id.*

The Bank of New York Mellon is not a party to the Philippines Proceeding.  Because

"there is greater need for § 1782 aid when the respondent is a non-participant," this factor

counsels in favor of granting Reyes's requests.  *Ahmad Hamad Algosaibi & Bros. Co. v. Stand.*

*Chartered Intern. (USA) Ltd.*, 785 F. Supp. 2d 434, 437 (S.D.N.Y. 2011).

### B.      There Is No Reason to Believe That a Philippine Court Would Reject Evidence Obtained Through Section 1782

Another consideration is whether the foreign tribunal would "reject evidence obtained

with the aid of section 1782."  *In re OOO Promnesftstroy*, 2009 WL 3335608, at *7 (S.D.N.Y.

Oct. 15, 2009).  In weighing this factor, courts presume that the foreign tribunal will be receptive

to evidence obtained in the United States:  "[a]bsent specific directions to the contrary from a

foreign forum, the statute's underlying policy should generally prompt district courts to provide

some form of discovery assistance."  *Euromepa*, 51 F.3d at 1102.  Thus, a court should deny

discovery on this basis only if there is "authoritative proof that [the] foreign tribunal would reject

evidence obtained with the aid of section 1782."  *Id.* at 1100.

Courts in the Philippines have previously been receptive to evidence obtained with U.S.

judicial assistance, and there is no reason to believe the court will not be receptive to evidence

obtained as a result of this Application.  In fact, the Rules of Procedure in the Philippines allow

for depositions to be taken in foreign countries and for commissions or letters rogatory addressed to a judicial authority in a foreign country.

Courts have also gauged receptiveness to U.S. judicial assistance by the existence of treaties facilitating cooperation. *See In re Servicio Pan American de Proteccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004). Both the Philippines and the United States are signatories to such treaties. For example, the United States and the Philippines are parties to the Treaty Between the Government of the Untied States and the Government of the Republic of the Philippines on Mutual Legal Assistance in Criminal Matters, signed at Manila on November 13, 1994. The Treaty provides for assistance in the prevention, investigation, and prosecution of criminal offenses, and in proceedings related to criminal matters. Assistance includes among other items taking testimony, providing documents, and locating or identifying persons or items.

### C.   Applicant Does Not Seek to Circumvent the Philippines' Discovery Laws or Restrictions

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. The *Intel* Court did not require that the evidence be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony sought need not be admissible abroad. *See Brandi-Dohrn*, 673 F.3d at 82 ("While *Intel* concerned the discoverability of evidence in the foreign proceeding, we see no reason why it should not extend to the admissibility of evidence in the foreign proceeding. As in *Intel*, there is no statutory basis for any admissibility requirement."); *see also Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."). Nor is there any requirement to exhaust one's remedies in the

18

foreign court first.  *See In re Metallgesellschaft AG*, 121 F.3d at 79 ("[A] 'quasi-exhaustion requirement,' finds no support in the plain language of the statute and runs counter to its express purposes.").

Reyes seeks documents and information addressing a limited number of issues at the core of the Philippines Proceeding.  There is no reason to believe that such basic discovery would violate any policy of the Philippine courts or that such a modest request would exceed any discovery limits imposed by those courts.

### D.  The Requested Discovery Is Narrowly Tailored and Directly Relevant to the Foreign Proceeding

The last *Intel* factor addresses the scope of the requests—specifically, whether they are "unduly intrusive or burdensome."  *Intel,* 542 U.S. at 265.  This standard tracks with general discoverability standards under the Federal Rules of Civil Procedure.  *See In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).

Reyes's request is narrowly tailored, temporally limited, and highly relevant to the Philippines Proceeding.[20]  The request will not be burdensome for the Bank of New York Mellon, as the time period at issue is narrow and the small volume of responsive documents will not impose a burden.

### CONCLUSION

The Bank of New York Mellon possesses information material to the Philippines Proceeding and crucial to the success of Reyes's defamation claims.  Applicant respectfully

---

[20]  Federal courts routinely grant similar expedited discovery in analogous circumstances, recognizing the heightened need created by a looming statute of limitations.  *See, e.g.*, *Old Ladder Litig. Co. v. Investcorp Bank B.S.C.*, No. 08 Civ. 0876(RMB)(THK), 2008 WL 2224292, at *2 (S.D.N.Y. May 29, 2008) (granting leave to conduct expedited discovery as to identity of unknown defendants because of statute of limitations' imminent expiration); *Wesley v. Muhammad*, No. 05 Civ. 5833(GEL)(MHD), 2008 WL 123812, at *13 (S.D.N.Y. Jan. 10, 2008) (same).

requests that the Court issue an order: (a) granting the *Ex Parte* Application and Petition for an Order to Conduct Discovery; (b) entering the Proposed Order attached to the Declaration of Dan Tan as Exhibit C; (c) authorizing Applicant, under 28 U.S.C. § 1782, to serve the Subpoena attached to the Tan Declaration as Exhibit B; and (d) granting any and all other relief to Applicant as deemed just and proper.

DATED:   New York, New York          Respectfully submitted,
         August 1, 2019

                              By:  _____

                                   Dan Tan Law
                                   Dan Tan
                                   305 Broadway
                                   Suite 750
                                   New York, NY 10007

                                   *Attorneys for Applicant Ismael Reyes*